UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------
UNITED STATES OF AMERICA,

                              v.

MOSES WITTY,

                          Defendant.

**MEMORANDUM & ORDER**
16-CR-218 (MKB)

---------------------------------------------------------------
MARGO K. BRODIE, United States District Judge:

      Defendant Moses Witty is charged in a two-count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and with possession of a defaced firearm in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B). (Indictment at 1, Docket Entry No. 10.) Witty moves to suppress the firearm recovered from his person, arguing that the firearm was discovered as the result of an unlawful search and seizure. (Def. Mot. to Suppress ("Def. Mot."), Docket Entry No. 15.) After a suppression hearing on February 28, 2017, the parties submitted supplemental briefing. (*See* Def. Mem. in Supp. of Def. Mot. ("Def. Mem."), Docket Entry No. 29; Gov. Opp'n to Def. Mem. ("Gov. Opp'n"), Docket Entry No. 31; Def. Reply in Supp. of Def. Mot. ("Def. Reply"), Docket Entry No. 32.) For the reasons discussed below, the Court denies the motion to suppress.

**I. Background**

    **a. Criminal complaint**

      At approximately 9:40 PM on January 8, 2016, three New York Police Department ("NYPD") officers observed Witty sitting on a bench in Robert Venable Park (the "Park") while they were on patrol in an unmarked police vehicle near the intersection of Conduit Boulevard

and Belmont Avenue in Brooklyn, New York. (Compl. ¶ 2, Docket Entry No. 1; Tr. of Suppression Hr'g dated Feb. 28, 2017 ("Tr.") 34.) The officers parked the vehicle and approached Witty, "who seemed very nervous." (Compl. ¶ 2.) The officers asked Witty whether he knew that the Park was closed and Witty responded that he did not. (*Id.*) The officers then asked Witty for identification and he produced a check cashing identification card with a faded picture but without a date of birth. (*Id.*) The officers asked Witty for his date of birth but he "would not respond and continued to seem nervous." (*Id.*) At that point, the officers decided to take Witty to the police precinct to verify his identity. (*Id.*) One of the officers asked Witty to stand so that he could perform a safety pat-down. (*Id.*) As Witty stood up from the bench, one of the officers saw a bulge in Witty's back pant pocket and the handle of a firearm protruding from the same pant pocket. (*Id.*) The officers recovered and secured a loaded .25 caliber F.E.I. Semi-automatic pistol with obliterated serial numbers from Witty's back pant pocket. (*Id.*) The officers arrested Witty and at the time of his arrest, Witty stated, "I fucked up. I'm going away, aren't I?" (*Id.*) Witty was taken to the 75th Precinct for processing. (*Id.* ¶ 3.)

   b. **Motion to suppress**

 Witty moved to suppress the physical evidence found on his person and the statements he made at the time of the arrest. (Def. Mot. 1.) Witty alleges that he was sitting on a park bench when police officers approached him and began to question him. (Decl. of Moses Witty in Supp. of Def. Mot. ("Witty Decl.") ¶ 2, Docket Entry No. 15-1.) The officers asked him to stand and patted him down. (*Id.*) The officers recovered a small firearm from his rear pocket and he later confessed to possession of the firearm. (*Id.*) Witty alleges that he was not aware that the Park was closed. (*Id.*) Witty argues that he was not doing anything "visibly wrong or illegal to cause the police to question and search [him]." (Witty Decl. ¶ 3, Docket Entry No. 15-1.) Witty

2

requested an evidentiary hearing. (Decl. of Michael Weil in Supp. of Def. Mot. ¶ 5, Docket Entry No. 15-2.)

### c. Suppression hearing

The Court held a suppression hearing on February 28, 2017. (Minute Entry dated Feb. 28, 2017; Tr. 1.) The Court received exhibits and heard testimony from Captain Timothy Skretch, one of the officers present at Witty's arrest. (Tr. 28:2, 33:12–13, 38:17–19, 59: 16–17.)

Captain Skretch testified that on January 8, 2017, he was on patrol in an unmarked police car with Sergeant Robert Agate and Police Officer Noel D'Amico in the vicinity of the Park that he described as a "high-crime" area. (Tr. 30:1–25, 31:1–17.) At approximately 9:30 PM, the officers were driving eastbound on Belmont Avenue, which borders the Park,[1] and Captain Skretch observed Witty sitting on a bench along a lighted pathway inside the Belmont Avenue entrance to the Park. (Tr. 34:11–25, 36:17–21.) Witty drew Captain Skretch's attention because the Park "was supposed to be closed at dusk" and it is a violation of the New York City Parks Code ("Parks Code") to be in the Park after dusk. (Tr. 35:4–6, 35:12–17.) Captain Skretch did not observe anyone else in the Park. (Tr. 35:1–3.)

Captain Skretch testified with the aid of photographs of the signs at the three entrances to the Park. (Tr. 38:22–40:6.) The sign at the Belmont Avenue entrance was titled "Playground" and included a list of activities that "Playground rules prohibit" which included, among other things, "[e]ntering the playground after it is closed," barbequing, using illegal drugs and alcohol, and littering. (Photograph of sign at Belmont Ave. entrance, Gov. Ex. 2F, annexed to Gov. Opp'n as Attachment 1; Tr. 38:10.) The sign also stated that the "playground closes a[t] dusk."

---

[1] Two Google Maps printouts showing the roadways surrounding the Park were admitted into evidence as government exhibits 1-A and 1-B. (Tr. 32:18–33:13.) The maps show that Belmont Avenue borders the North side of the Park.

(Tr. 40:3–6.) The Sheridan and Sutter Avenue signs included the same prohibitions as the Belmont Avenue sign but the rules were labelled "Park rules," rather than playground rules, and similarly, the signs were titled "New York City Parks." (Photograph of sign at Sheridan Ave. entrance, Gov. Ex. 2D; Photograph of sign at the Sutter Ave. entrance, Gov. Ex. 2B.) The Sheridan and Sutter Avenue signs provided that "[t]his park closes at dusk."[2] (*Id.*; Tr. 39:7–11.) Captain Skretch testified that, to his knowledge, the signs were not obstructed in any way on the night of the arrest. (Tr. 61:20–25.) The Park has a skate park, basketball courts, handball court, and a workout area. (Tr. 57:16–58:8.) The Park also has a separately fenced-in swing set for smaller children near the Sutter Avenue side of the Park. (Tr. 58:4–9.)

Upon observing Witty in the Park, the officers circled the perimeter of the Park in the police car and returned to the Belmont Avenue entrance. (Tr. 41:2–43:13.) The gate at the Belmont Avenue entrance to the Park was open and the officers drove the car onto the pathway into the Park and stopped the vehicle just short of the bench where Witty sat. (Tr. 43:14–44:8, 60:3–11.) Captain Skretch did not believe that the siren was activated and could not recall whether the lights were activated as the car approached Witty. (Tr. 45:14–46:3.)

The three officers got out of the vehicle and approached Witty. (Tr. 44: 21–24.) Officer D'Amico approached Witty directly and Sergeant Agate and Captain Skretch "took positions around the bench." (Tr. 46:6–8.) Officer D'Amico was standing immediately next to Witty on his right side. (Tr. 49:3–7.) Captain Skretch was standing directly in front of Witty but about five-to-seven feet away from him. (Tr. 48:20–25.) Sergeant Agate was standing at a similar

---

[2] The Sheridan Avenue entrance appears to have had a second sign that was identical to the sign at the Belmont Avenue entrance. (Photograph of sign at Sheridan Ave. entrance, Def. Ex. C.)

4

distance from Witty, but to Witty's left. (Tr. 49:8–10.)

Officer D'Amico asked Witty why he was in the Park and Witty responded that he was waiting for a friend. (Tr. 46: 10–14.) Witty also said that he did not know the Park was closed.[3] (Tr. 62:22–63:12.) Officer D'Amico then asked Witty for identification so that Captain Skretch could use his cellphone to search the NYPD's database for any relevant records pertaining to Witty. (Tr. 46:16–17, 47:5–48:5.) Witty provided a "sort of paper receipt" and Officer D'Amico handed it back to Witty because it did not include identification information. (Tr. 46:18–23.) Officer D'Amico then asked Witty for his name and date of birth. (Tr. 47:3–4.) Witty gave Officer D'Amico his correct name, (Tr. 55:9–13), but did not provide a valid date of birth. The government recalled Captain Skretch to clarify the testimony regarding what information, if any, Witty provided in the Park about his date of birth. According to Captain Skretch's initial and subsequent testimony, Witty "originally had stated that his birthday was sometime in September," but then gave a different date of birth and, upon returning to the precinct, the officers later determined his "birthday was actually in December." (Tr. 48:7–10, 55:3–8, 71:7–13.) Witty remained seated on the bench as the officers approached him and began to question him. (Tr. 55:18–56:6.)

Captain Skretch was unable to locate Witty in the NYPD database. (Tr. 50:13–14.) Based on his training and experience as a police officer, Captain Skretch observed that during D'Amico's questioning, Witty "appeared to be nervous, given the fact that he was changing his date of birth." (Tr. 48:11–19.) Witty's behavior and the inability to locate him in the NYPD

---

[3] Although Captain Skretch offered unclear testimony as to whether Witty indicated that he did not know the Park was closed, the government stipulated that Witty was asked whether he knew the Park was closed and said that he did not know. (Tr. 62:22–63:12.)

5

database led Captain Skretch to conclude that he "seemed to be evasive; that he was attempting to give [the officers] a false identity." (Tr. 48:13–18.) Captain Skretch continued to search for Witty in the NYPD database. (Tr. 49:20–21.)

At some point, Captain Skretch heard Officer D'Amico ask Witty to stand up from the bench and as Witty was standing, D'Amico instructed Witty to get on the ground. (Tr. 49:22–24, 50:19–23.) Captain Skretch looked up from his cellphone and saw that Officer D'Amico was "taking [Witty] down to the ground on the sidewalk" and he immediately began to assist. (Tr. 51:10–14.) In the process of taking Witty to the ground, Officer D'Amico stated a code word to Captain Skretch communicating that Witty was in possession of a gun. (Tr. 51:14–16.) The officers handcuffed Witty, secured the gun, (Tr. 51:18–52:3), and took Witty to the 75th Precinct, (Tr. 52:12–13). On the way to the precinct, Captain Skretch overheard Witty say "I'm fucked."[4] (Tr. 52:14–16.)

## II. Discussion

### a. Standards of review

#### i. Motion to suppress

"On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure." *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (citing *United States v. Arboleda,* 633 F.2d 985, 989 (2d Cir. 1980)). Once the defendant has shown a basis for his motion, the burden shifts to the government to demonstrate that the search or seizure did not violate the Fourth Amendment. *Id.* (citing *Arboleda*, 633 F.2d at 989, *United States v. Pera*, 986 F.2d 633, 639 (2d

---

[4] After hearing arguments from the parties, the Court set a briefing schedule for supplemental briefing and reserved decision on the motion. (Tr. 71:25–88:13, 88:14–22.)

Cir. 1993) and *United States v. Pena*, 961 F.2d 333, 338–39 (2d Cir. 1992)); *see United States v. Bristol*, 819 F. Supp. 2d 135, 143 (E.D.N.Y. 2011) (noting that, on a motion to suppress, the government bears the burden of showing the requisite suspicion to justify a stop).

The parties do not dispute that the police officers seized Witty and searched him without a warrant. Thus, the government bears the burden to demonstrate that the search did not violate the Fourth Amendment. The government argues that the officers had probable cause to arrest Witty and lawfully searched him incident to arrest.[5] (Gov. Opp'n 7 ("The search of the defendant and recovery of the firearm was lawful as a search incident to arrest.").)

### ii. Probable cause

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV; *United States v. Bailey*, 743 F.3d 322, 331 (2d Cir.), *cert. denied*, 574 U.S. ---, ---, 135 S. Ct. 705, 705 (Dec. 1, 2014)). "A warrantless search is '*per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'" *United States v. Aguiar*, 737 F.3d 251, 259 (2d Cir. 2013) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One well-recognized exception to the warrant requirement is the search incident to arrest doctrine, under which police may search persons provided there is probable cause for the arrest. *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980); *see also United States v. Williams*, 568 F. App'x 25, 27 (2d Cir. 2014) (noting exception for "searches incident to arrest, [which] permits the police to search a lawfully arrested person and

---

[5] There was no testimony at the suppression hearing that the officers discovered the gun pursuant to a pat-down as Witty initially indicated in his declaration in support of the motion to suppress. (Witty Decl. ¶ 2.) Both Witty and the government represent that the officers saw the gun when Witty stood up pursuant to Officer D'Amico's instruction. (Def. Mem. 3 ("[Witty] was directed to stand for this purpose, and the police apparently saw the firearm in his rear pocket when he did."); Gov. Opp'n 4.)

7

areas within his immediate control" (quoting *Smith v. Ohio*, 494 U.S. 541, 543 (1990)) (internal quotation marks omitted)). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001). Similarly, even if an officer had the subjective intent to issue a summons, where there is a basis for an arrest, an officer may perform a search incident to arrest prior to issuing a summons or citation. *United States v. Diaz*, 854 F.3d 197, 208–09 (2d Cir. 2017).

Probable cause to arrest exists when an officer "ha[s] knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Id.* at 203 (quoting *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010); *see also United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983). Determining whether officers had probable cause is an objective inquiry that must be based on the "totality-of-the-circumstances." *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983).

An arrest is constitutionally valid if there is probable cause to justify the arrest at its initiation, even if the offense providing probable cause for the arrest is different from the offense ultimately charged. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (explaining that probable cause "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest," and that the probable cause inquiry is objective rather than subjective); *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (applying *Devenpeck* to a section 1983 false arrest claim to determine whether officers had probable cause); *see also Herron*, 18 F. Supp. 3d at 233 (noting that the ultimate disposition of charges resulting from the arrest is "truly irrelevant" to the question of whether the officer had probable cause at the time of

8

the arrest).

### b. The officers had probable cause to arrest Witty

Witty argues that the officers did not have probable cause to arrest him because they could not infer that he *knew* that the Park was closed.[6] (Def. Mem. 9.) Witty specifically argues that "[a] law that made disobedience of whatever prohibitions a government official elected to place on a sign without any requirement of knowledge or notice would surely violate the Due Process Clause's requirement that criminal laws provide a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" (Def. Reply 3.)

Although the prudence of the Parks Code is not the issue before the Court, the Court nevertheless assumes, without deciding, that there is a knowledge element that should be read into the Parks Code.[7] Thus, the officers had to at least infer that Witty had notice of the Park

---

[6] Although Witty focuses his arguments on section 1-03(c)(2) of the Parks Code, which criminalizes failure to obey a park sign, the Court also considers whether the officers had probable cause to arrest Witty for a violation of section 1-03(a)(3), which criminalizes entering or remaining in a park after it is closed. *See United States v. Diaz*, 122 F. Supp. 3d 165, 171 (S.D.N.Y. 2015) ("[A]n officer's subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause. Put simply, an arrest — and, by extension, a search incident to arrest — is not unlawful so long as the officer has knowledge of, or reasonably trustworthy information as to, facts and circumstances sufficient to provide probable cause to believe that the person arrested has committed any crime." (internal quotation marks omitted) (quoting *Zelnner v. Summerlin*, 494 F.3d 344, 368–69 (2d Cir. 2007))), *aff'd*, 854 F.3d 197 (2d Cir. 2017); *see also Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (noting that to determine whether probable cause existed "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest").

[7] The plain language of the Parks Code does not indicate an explicit scienter requirement. Witty instead relies on New York Penal Law section 15.15(2) which provides that a *mens rea* element is included in any statute defining an offense unless the statute "clearly indicat[es] a legislative intent to impose strict liability." (Def. Mem. 5 (citing N.Y. Penal Law § 15.15(2).) The Court does not need to decide the issue because the posted signs at the Park provided sufficient notice to Witty of the closing hours, and, even in cases involving trespass where there is an explicit knowledge requirement, the relevant inquiry as to notice is whether the

9

closing hours in order to have probable cause for his arrest. *See, e.g.*, *Cooper v. Dieugenia*, No. 14-CV-6136, 2017 WL 818367, at *4 (E.D.N.Y. Feb. 27, 2017) (denying summary judgment on a section 1983 false arrest claim for an arrest made pursuant to section 1-03(a)(1) because there was a disputed issue of fact as to whether there was a park sign posted on the night of the arrest that was "visible to [the plaintiff] or the officers, or in legible condition"); *People v. Caba*, 910 N.Y.S.2d 373, at *1 (App. Div. 2010) ("[O]nce the police officers witnessed the defendants trespassing into a park owned and operated by the City of New York, the entrance of which had a posted sign indicating that the park closed several hours earlier at dusk, they had probable cause to issue them summonses for committing a violation [of section 1-03(a)(1) and 1-03(a)(3)] and/or arrest them for misdemeanors."); *People v. Davis*, 867 N.Y.S.2d 19, at *1 (App. Div. 2008) (finding information charging the defendant with a violation of section 1-03(c)(2) legally sufficient where "[t]he information alleged that a sign in Betsy Park indicated that the park closes after 9[:00] P.M. and that the complainant observed defendant in the park after dark at 2:06 A.M. on December 15, 2005."), *aff'd*, 13 N.Y.3d 17 (2009)).

The Parks Code regulates the hours of operation of parks and states that unless "other open hours are posted at any park," New York City parks are closed from 1:00 AM until 6:00 AM. 56 R.C.N.Y. § 1-03(a)(1). It is a violation of the Parks Code to enter or remain in any park when it is closed to the public. *Id.* § 1-03(a)(3). Parks Code section 1-03(c)(2) provides that "[n]o person shall fail to comply with or obey any instruction, direction, regulation, warning, or prohibition, written or printed, displayed or appearing on any park sign, except such sign may

---

sign is conspicuous, and, as further discussed below, the sign here was conspicuous. *See, e.g.*, *United States v. Gomez*, No. 09-CR-408, 2010 WL 431878, at *1 (S.D.N.Y. Feb. 8, 2010) ("Knowledge of the trespass is assumed if "notice [of the trespass] is given by posting in a conspicuous manner." (citing New York Penal Law § 140.00)), *reconsidered on other grounds*, 2010 WL 431878, at *1 (S.D.N.Y. Feb. 8, 2010).

be disregarded upon order by a Police Officer or designated Department employee." *Id.* § 1-03(c)(2). Violation of the Parks Code constitutes a misdemeanor punishable by "not more than ninety days imprisonment or by a fine of not more than $1,000, or by both." *Id.* § 1-07(a).

Where knowledge or notice of a sign is required as an element of an offense, such as for a trespassing offense, it is reasonable for officers to infer that a perpetrator has knowledge of the sign if the sign is conspicuously posted. *See, e.g.*, *United States v. Gomez*, No. 09-CR-408, 2010 WL 431878, at *1 (S.D.N.Y. Feb. 8, 2010) ("Knowledge of the trespass is assumed if 'notice [of the trespass] is given by posting in a conspicuous manner.'" (quoting New York Penal Law § 140.00)). Whether or not a sign is conspicuously posted generally depends on the location of the sign and whether the sign is visible to those entering the premises. *See, e.g.*, *Cooper*, 2017 WL 818367, at *4 (noting whether a sign is "visible" and in "legible condition" as relevant to whether there was probable cause to arrest for a violation of section 1-03(a)(1)); *Gomez*, 2010 WL 431878, at *1 (finding no probable cause to arrest for a trespass violation where the sign was "practically invisible" when approached from a certain angle); *People v. Outlar*, 677 N.Y.S.2d 430, 435–36 (Crim. Ct. 1998) (the failure to have any signs does not provide conspicuous notice to infer that the defendant had knowledge that he was trespassing).

Here, the facts are largely undisputed.[8] Captain Skretch testified that he saw Witty sitting in the Park that Officer Skretch knew was closed, and that the signs posted at the entrances to the

---

[8] The only fact in dispute is whether Captain Skretch credibly testified that Witty gave more than one date of birth at the Park; Witty argues Skretch's testimony was unclear and not reliable and the government contends that the testimony was clear and relies on the testimony as "additional probable cause" for Witty's arrest. (Def. Mem. 11; Gov. Opp'n 4, 6.) Because the Court finds that the officers had probable cause for the arrest prior to questioning Witty regarding his identification, the Court need not rely on this portion of Skretch's testimony. For similar reasons, the Court does not address whether the Park's location in a "high-crime" area contributed to the officer's probable cause determination.

11

Park stating that the Park closed at dusk were unobstructed.[9] (Tr. 35:4–6, 35:12–17, 39:7–11, 40:3–6, 61:20–25.) The Park sign at the Belmont Avenue entrance, nearest to where Witty was sitting, indicates, among other instructions, that the "playground closes a[t] dusk." (Tr. 40:3–6.) The Sutter Avenue sign similarly provides that the "park closes at dusk." (Tr. 39:7–11.) The Sheridan Avenue entrance appears to have had two different signs, one indicating that the "playground closes a[t] dusk" and the other indicating that the "park closes at dusk." (Photograph of sign at Sheridan Ave. entrance, Def. Ex. C; Photograph of sign at Sheridan Ave. entrance, Gov. Ex. 2D.) Each of the signs prohibits entering the Park or playground after the area is closed and provides that the Park or playground closes at dusk. (Photograph of sign at Belmont Ave. entrance, Gov. Ex. 2F; Photograph of sign at Sheridan Ave. entrance, Gov. Ex. 2D; Photograph of sign at the Sutter Ave. entrance, Gov. Ex. 2B.) New York State appellate courts have found similar circumstances sufficient to support probable cause for violations of the relevant provisions of the Parks Code. *See, e.g.*, *Caba*, 910 N.Y.S.2d at *1 ("[O]nce the police officers witnessed the defendants trespassing into a park owned and operated by the City of New York, the entrance of which had a posted sign indicating that the park closed several hours earlier at dusk, they had probable cause to issue them summonses for committing a violation [of section 1-03(a)(3)] and/or arrest them for misdemeanors. The officers were thus entitled to

---

[9] Witty argues that the officers did not observe conduct that violated section 1-03(c)(2), violation of a park sign, because the Park signs prohibited "entering" the playground after it was closed and the officers did not observe Witty *enter* the Park. (Def. Mem. 11 n.5.) The Court does not find this argument persuasive. It was reasonable for the officers to conclude that Witty was in violation of the law by being in the Park after dusk even if Witty entered the Park prior to dusk, as the sign clearly indicated that the Park closed at dusk and Witty's presence in the Park after dusk was in violation of the closing hours posted on the signs. (Tr. 40:5–6.) Moreover, because Witty was present in the Park after it was closed, Captain Skretch also had probable cause to arrest Witty for violating section 1-03(a)(3), which makes it a misdemeanor to merely be present in a closed park. (Tr. 35:5–15.)

pursue and arrest the defendants when they fled after trespassing[, a violation of C.P.L section 140.10(1)(a),] into the park in the officers' presence."); *Davis*, 867 N.Y.S.2d at *1 (finding that an information charging the defendant with a violation of section 1-03(c)(2) was legally sufficient where "[t]he information alleged that a sign in Betsy Park indicated that the park closes after 9[:00] P.M. and that the complainant observed defendant in the park after dark at 2:06 A.M. on December 15, 2005"), *aff'd*, 13 N.Y.3d 17 (2009)).

Based on the totality of the circumstances, a reasonable person would be justified in concluding that Witty's presence in the Park was a violation of sections 1-03(a)(3) and 1-03(c)(2) — no one was permitted in the Park after dusk, the officers observed Witty in the Park well after dusk, the Park's closing hours were posted on signs at each of the entrances to the Park, and the signs were unobstructed. *See, e.g.*, *United States v. Mason*, 550 F. Supp. 2d 309, 318 (E.D.N.Y. 2008) ("The issue in this case is not whether the sign was 'conspicuously posted' but whether the [officers] could have reasonably believed a violation of N.Y. Penal Law [section] 140.10(e) occurred. Though partially torn, the sign was legible, particularly the portion prohibiting trespassing in the lobby. It was approximately a foot long, and several inches tall. A reasonable police officer would be justified in concluding that the 'conspicuously posted' requirement of [section] 140.10(e) was satisfied." (citations omitted)); *cf. Cooper*, 2017 WL 818367, at *4 (denying summary judgment on a section 1983 false arrest claim for an arrest pursuant to section 1-03(a)(1) because there was a disputed issue of fact as to whether there was a park sign posted on the night of the arrest that was "visible to [the plaintiff] or the officers, or in legible condition"); *United States v. Breedlove*, 424 F. Supp. 2d 379, 386 (D. Conn. 2006) (finding that officers lacked probable cause for a violation of criminal trespass in the third degree under Connecticut law because the officers were aware that certain entrances to the premises *did*

13

*not include* "no trespassing" signs and the area was regularly used by pedestrians).

Witty makes several arguments in support of his assertion that the officers could not have inferred his knowledge of the Park closing hours and therefore did not have probable cause to arrest him. The Court addresses each argument below.

First, Witty argues that the officers could not have inferred that he knew the closing time of the Park from the signs because the language concerning the closing hours was "buried at the bottom of a laundry list of prohibitions" "in fine print." (Def. Mem. 10–11.) The Court is not persuaded that the number of prohibitions on the signs or the size of the print suggest lack of knowledge on Witty's part because, even though there was no testimony as to the size of the signs, the photographic exhibits showed that the signs were large enough to be clearly visible. Moreover, even if the signs' instructions were ambiguous, the officers justifiably relied on the clearly posted and unobstructed signs to infer that Witty had knowledge of the Park's closing hours given the practical constrains on police officers in the field. *See, e.g.*, *Zalaski v. City of Hartford*, 723 F.3d 382, 393 (2d Cir. 2013) ("because 'the practical restraints on police in the field are greater with respect to ascertaining intent . . . the latitude accorded to officers considering the probable cause issue in the context of *mens rea* crimes must be correspondingly great.'" (quoting *Cox v. Hainey*, 391 F.3d 25, 34 (1st Cir. 2004)). In addition, although the closing hours and all of the prohibitions are in "fine print," the closing time is separated from the list of other prohibitions by a space, causing it to stand out, and the instruction is posted on a conspicuous, unobstructed sign. *Cf. United States v. Gomez*, No. 09-CR-408, 2009 WL 4030851, at *3 (S.D.N.Y. Nov. 20, 2009) (relying on "the fact []that the signs clearly state, in larger font than the remainder of the signs, 'This Park Closes at 10 PM'" as one factor to deny the motion to suppress), *reconsidered on other grounds*, 2010 WL 431878, at *1 (S.D.N.Y.

Feb. 8, 2010).

Witty next argues that the Belmont Avenue Entrance sign referred to the "playground," which a reasonable person might have understood to be the separate fenced-in swing set within the Park and not the entire Park, thereby creating ambiguity that should defeat any inference that Witty knew the Park closed at dusk. (Defs. Mem. 10–11.) However, while the language on some of the signs specifies that the "playground," rather than the Park, "closes at dusk," (Tr. 40:3–6), the reference to "playground" does not render the signs inconspicuous. Such a narrow reading of "playground" would render many of the prohibitions on the signs meaningless — for example, the prohibition on barbequing, using illegal drugs and alcohol and littering could not reasonably be understood to only apply to the small fenced-in swing set within the Park. *See, e.g.*, *People v. Garcia*, 907 N.Y.S.2d 439, 2010 WL 817498, at *5 (Sup. Ct. Mar. 10, 2010) (finding officers had reasonable suspicion that the defendant was trespassing in a closed park because list of prohibitions on a park sign referring to "playground" made it "patently unbelievable that the spirit of the posted sign could in any way be limited to the jungle gym / swing area"). In addition, the fenced-in swing set is located near the Sutter Avenue entrance and not the Sheridan or Belmont Avenue entrances, where the posted signs referred to the "playground," (Tr. 39:7–11; 40:3–6; 58:4–9; Photograph of sign at Sheridan Ave. entrance, Def. Ex. C), further undermining Witty's argument that "playground" referred exclusively to the fenced-in swing set area of the Park.

Witty's additional argument that the open park gate at the Belmont Avenue entrance was a "physical signal that the [P]ark was open — a signal far more obvious than the fine print of the sign," is also unpersuasive. (Def. Mem. 10.) Witty relies on *United States v. Gomez* to support this argument, but his reliance is misplaced. In *Gomez*, a trespass case, the court concluded that

15

the park signs failed to provide conspicuous notice sufficient for officers to develop probable cause that the defendant committed criminal trespass in the third degree because the signs were "practically invisible." *Gomez*, 2010 WL 431878, at *1. The court noted that, "[i]f a person approaches the entrance from the side without the sign, the sign is practically invisible, even in well-lit conditions, hidden by the turret on the opposite of the entrance, or obscured by the angle of the fence." *Id.* The court found that the obstructed sign was even more problematic because, "the entrances to the park are wide and unobscured, and are not constructed so as to exclude intruders or to indicate times when the [p]ark is off-limits." *Id*. The court specifically noted that in order to be guilty of criminal trespass in the third degree, the premises must be "fenced or otherwise enclosed in a manner designed to exclude intruders." *Id.* (citing N.Y.P.L. § 140.10). There is no similar fencing requirement in the Parks Code, which renders the open gate less significant. In addition, unlike in *Gomez*, the signs at issue here are unobstructed and posted at each entrance to the Park. Thus, under the circumstances of this case, the open gate does not diminish the basis for probable cause.

      Witty also argues that his statement to the officers that he did not know the Park was closed and the lack of suspicious behavior after the officers approached him undermine the finding of probable cause. (Def. Mem. 11–12.) However, neither his statement denying knowledge or his lack of suspicious behavior are relevant to the Court's determination because the officers had sufficient facts to support probable cause that Witty had committed a violation of the Parks Code at the time they saw Witty in the Park. The officers were therefore not required to credit Witty's claim of innocence or to continue to investigate because the circumstances already would lead a person of reasonable caution to believe that Witty was violating the Parks

16

Code.[10] *See Finigan v. Marshall*, 574 F.3d 57, 63 (2d Cir. 2009) (holding that an individual's belief that she had legal title to be on the premises did not undermine probable cause for trespass because the facts available at the time of the arrest need "only cause a person of reasonable caution to believe that a crime had been or was about to be committed" and the officers need not make a final determination of guilt); *Sewell v. City of New York*, No. 10-CV-5039, 2011 WL 1748733, at *3 n.3 (E.D.N.Y. May 9, 2011) ("It is hardly uncommon for people suspected of crimes to deny their involvement.  When they do, police officers who have probable cause to arrest are not required to adjudicate disputed issues of fact on the spot, nor are they required to walk away. Once a police officer has probable cause, he need not explore "every theoretically plausible claim of innocence before making an arrest." (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997))).

Witty also relies on several trespass cases to argue that his lack of suspicious behavior while interacting with the officers undermines the basis for probable cause.  (Def. Mem. 11–12 ("The facts of this case simply do not resemble those in which Courts have found the defendant's conduct contributed to an inference of knowledge."); *id.* at 12 (citing *People v. Barksdale*, 974 N.Y.S. 2d 347 (App. Div. 2013); *People v. Hendricks*, 841 N.Y.S.2d 94 (App. Div. 2007); *People v. Tinort*, 709 N.Y.S.2d 511 (App. Div. 2000); *People v. Babarcich*, 561 N.Y.S.2d 255 (App. Div. 1990); *People v. Jones*, 523 N.Y.S.2d 187 (App. Div. 1987)).)  This argument is unavailing for the same reasons Witty's denial of knowledge that the Park was closed is

---

[10] Moreover, during the hearing on Witty's motion to suppress, Witty seems to have suggested that the officers were not bound by his statement that he did not know the Park was closed.  (Tr. 74:10–14 ("THE COURT: Your argument is that while that is reasonably suspicious, it does not rise to probable cause because he then told them he did not have knowledge.  MR. WEIL: I am not saying that they're bound by his denial.").)

17

unavailing — the officers had probable cause at the time they observed Witty in the Park. Moreover, because there is a distinction between the elements necessary to prove a violation of the Parks Code and the crime of trespass, these cases do not support the argument that Witty's conduct after he was approached by the officers is relevant to whether the officers had probable cause to arrest Witty for a violation of the Parks Code. *See generally Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) ("To ascertain the existence of probable cause, we look at the facts as the officers knew them in light of the specific elements of each crime.").

In a trespass case, an offender must have knowledge that he or she entered the property or premises in question *and* knowledge that he or she is not licensed to be on the property.[11] Witty seems to suggest that a finding that there is a knowledge element implicit in the Parks Code necessarily requires importing the trespass license exception into the Parks Code. (Def. Mem. 6 ("[Imposing a knowledge requirement] makes the parks provision — insofar as it prohibits presence at night — entirely consistent with state trespass law, which requires that a person know his presence is prohibited before imposing liability. *People v. Basch*, 36 N.Y.2d 154, 159 (1975) ("[A] person . . . who honestly believes that he is licensed or privileged to enter[] is not

---

[11] New York's non-criminal trespass statute only penalizes a person who "knowingly enters or remains unlawfully in or upon premises." N.Y. Penal Law § 140.05. New York Penal Law section 140.00 provides that "A person 'enters or remains unlawfully' in or upon a premises when he is not licensed or privileged to do so." N.Y. Penal Law § 140.00. The scienter element "knowingly" modifies entering and remaining as well as without a "license or privilege." *See, e.g., People v. Durst*, 983 N.Y.S.2d 205, at *3 (Crim. Ct. 2013) ("[T]he People must also establish that the defendant acted 'knowingly.' This adverb modifies both elements — the People must prove that the defendant entered a premises 'knowingly'; that is, that he did not enter accidentally, and that he did so knowing that he lacked a license or privilege to enter." (citation omitted)). The New York Court of Appeals has held that it is the State's burden to prove that an individual does not have a privilege or license to remain on the premises. *New York v. Brown*, 25 N.Y.2d 374, 377 (1969) (holding that the government must prove every element of criminal trespass, including the "absence or loss of a statutory privilege or license to enter and remain").

guilty of any degree of criminal trespass. . . ."); *id.* at 7–8 (advocating that the Parks Code should be treated the same as trespass, "i.e., as requiring knowledge that one is not licensed to be in the park").)

Unlike in trespass cases, however, there is no second "license" element to the Parks Code, and therefore the government is not required to prove whether the individual had a right to disobey the sign or to be in a park after it is closed. Finding an implied knowledge requirement in the Parks Code does not add an additional license element to the statute. Indeed, the New York Court of Appeals has held that the language in section 1-03(c)(2), which provides that a person may disobey or fail to comply with a park sign "upon order by a Police Officer or designated Department employee," is a "proviso" and not an "exception" and, as such, it is a defendant's burden to prove that the proviso applies in order to avoid criminal liability. *People v. Davis*, 13 N.Y.3d 17, 31–32 (2009) ("[T]he City's Parks Department did not intend that the People plead and prove that no police officer or Parks Department employee had authorized defendant to ignore a posted closing time. Such information is uniquely within a defendant's knowledge, and to require the People to plead and negate the existence of the relevant permission would require them to go to intolerable lengths, including innumerable interviews of officers and employees in the area during the date in question." (citations and internal quotation marks omitted)).[12] Therefore, to the extent Witty is arguing that reading a knowledge requirement into the Parks Code requires also adding a license exception to the Parks Code, the Court disagrees. The officers were not required to perform any further inquiry or determine whether Witty had knowledge of the Park's closing hours because, unlike in the trespass context where a person's

---

[12] Similar logic applies to the qualifying language in section 1-03(a)(3) that indicates a person shall not enter or remain in a park after it is closed "without the permission of the Commissioner." 56 R.C.N.Y. § 1-03(a)(3).

19

presence may or may not be lawful upon first appearance and an officer would be required investigate whether the person has a license or permission to be at the location, no one was permitted in the Park after closing hours. *See Mitchell v. City of New York*, 841 F.3d 72, 78–79 (2d Cir. 2016) ("Because it is an element of the crime, officers must have probable cause to believe that a person does not have permission to be where she is before they arrest her for trespass." (citations and internal quotation marks omitted)).

Accordingly, based on the presence of the unobstructed posted notice of the Park's closing time, in addition to Witty's presence in the Park after dusk, the officers had probable cause to arrest Witty for violating the Parks Code section 1-03(c)(2) — violation of a Park sign, and section 1-03(a)(3) — unlawful presence in the Park after it is closed, which are both misdemeanor offenses for which the officers could arrest Witty and perform a search incident to arrest. *Diaz*, 854 F.3d at 208–09 (holding that a search incident to arrest is lawful even if the police only intend to issue a summons for the offense).

### III. Conclusion

For the foregoing reasons, the Court denies Witty's motion to suppress.

SO ORDERED:

    s/ MKB
MARGO K. BRODIE
United States District Judge

Dated: July 26, 2017
       Brooklyn, New York